1  Jon Borderud, Esq. (SBN 134355)
   LAW OFFICE OF JON BORDERUD
2  7 West Figueroa Street, 3rd Floor
   Santa Barbara, CA 93101
3  Tel: (310) 621-7004 direct
   Email: borderudlaw@cox.net
4
   YI SUN KIM, ESQ. (State Bar No. 252303)
5  ykim@gblawllp.com
   JEREMY H. ROTHSTEIN, ESQ. (State Bar No. 316140)
6  jrothstein@gblawllp.com
   G&B LAW, LLP
7  16000 Ventura Boulevard, Suite 1000
   Encino, California 91436
8  Tel: (818) 382-6200 • Fax: (818) 986-6534

9  Attorneys for Plaintiffs
   CHARLES DUFF and CATHRYN DUFF
10

11              **UNITED STATES BANKRUPTCY COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                   **NORTHERN DIVISION**

| | |
|---|---|
| 14  In re | Case No.: 9:18-bk-11889-DS |
| 15  CHARLES L. DUFF, | (Chapter 11) |
| 16  Debtor and Debtor-in-possession. | Adv. No.: |
| 17  CHARLES DUFF and CATHRYN DUFF, as individuals, | **COMPLAINT FOR:** |
| 18 | (1)  Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); |
| 19  Plaintiffs, | |
| 20  vs. | (2)  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c)); |
| 21  COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, COUNTRYWIDE HOME LOANS, a New York corporation, COUNTRYWIDE BANK, N.A., a national association, BANK OF AMERICA CORPORATION, a Delaware corporation, LANDSAFE, INC., a Delaware corporation, LANDSAFE APPRAISAL, INC., a California Corporation, THE BANK OF NEW YORK MELLON, a New York corporation; BAYVIEW LOAN SERVICING, LLC, a Delaware limited liability company; NEWREZ LLC dba SHELLPOINT MORTGAGE SERVICING, and DOES 1-10. | (3)  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(d)); |
| 22 | (4)  Unjust Enrichment; |
| 23 | (5)  Fraud; |
| 24 | (6)  Violations of the Fair Debt Collection Practices Act (15 U.S.C. §§ 1692 – 1692p) |
| 25 | |
| 26 | (7)  Breach of Covenant of Good Faith and Fair Dealing; and |
| 27 | |
| 28  Defendants. | (8)  Promissory Estoppel |

1       For their Complaint against Defendants Countrywide Financial Corporation, Countrywide
2 Home Loans, Inc., Countrywide Bank, N.A. (together "Countrywide"), Bank of America
3 Corporation ("BofA"), LandSafe, Inc., LandSafe Appraisal, Inc. (together "LandSafe"), Bank of
4 New York Mellon ("BONYM" and collectively with the foregoing, the "Defendants"), as Trustee
5 for the Certificate Holders of CWALT, Inc., Alternative Loan Trust 2006-HY3, Mortgage Pass-
6 Through Certificates Series 2006-HY3 and as Trustee for the Certificate Holders of the CWALT,
7 Inc. Alternative Loan Trust 2006-HY13, Mortgage Pass-Through Certificates, Series 2006-HY13,
8 and against defendants Bayview Loan Servicing, LLC ("Bayview") and NewRez LLC dba
9 Shellpoint Mortgage Servicing ("Shellpoint"), Plaintiffs Charles Duff and Cathryn Duff
10 ("Plaintiffs") hereby allege as follows based on information and belief:

## OVERVIEW OF THE ACTION

1.    This case concerns a devious, illegal and fraudulent scheme by Defendants to generate as many subprime home mortgage loans as possible, by any means possible, so they could fill up their mortgage origination pipeline which needed a steady stream of thousands of new home mortgage loans each month, so that these mortgage loans could be bundled, securitized and sold off to Wall Street for enormous profits as mortgage-backed securities ("MBS"). As a result of the illegal and fraudulent scheme and conduct alleged herein, between 2003 and 2008 Countrywide became the largest subprime mortgage lender in the United States, originating over *$400 billion in new mortgage loans each year,* becoming one of the largest suppliers of mortgage backed securities to Fannie Mae, Freddie Mac and Wall Street.

2.    Between 2000 and 2007, Countrywide sold over $74.5 *billion* worth of mortgage-backed securities from the subprime loans it originated and sold. In 2007 alone, Countrywide's chief executive officer, Angelo Mozilo, received over ***$121.5 million in in executive compensation*** – the same year in which tens of thousands of Americans began losing their homes to foreclosure as a result of Countrywide's illegal and fraudulent appraisal schemes and loan practices as alleged herein.

3.    While Countrywide and its top executives were making money hand over fist, the highly risky loans Countrywide created and sold off to Fannie Mae, Freddie Mac, and Wall Street

1786874.1 -- 32349.0001

began to fail on a massive scale.  More than 3.1 million foreclosure proceedings were filed against U.S. homeowners in 2008 alone.  Within two years, over 1.2 million people in America would lose their homes to foreclosure, due in no small part to the illegal and fraudulent appraisal and lending practices of Countrywide.  In fact, many families, including Plaintiffs, are still losing their homes to this day as a result of Countrywide's illegal and fraudulent appraisal and lending practices for the reasons alleged herein, which put families in loans they could ill afford so that Countrywide could keep its mortgage pipeline full, and Mozilo and the other Countrywide executives could make hundreds of millions of dollars each year in executive compensation and bonuses.

4.      Not only did Countrywide's illegal and fraudulent appraisal and lending practices lead to *more than a million families* losing their homes through foreclosure, its conduct also played a major role in the financial collapse of 2008 which brought the U.S. economy to its knees and resulted in millions of Americans losing their jobs as well as their homes.  This debacle also cost U.S. taxpayers over *700 billion dollars* to bail out the banks that had invested heavily in the mortgage-backed securities Countrywide and others created that were filled with badly underwritten and highly risky loans secured by fraudulently appraised properties.  In fact, the amount taxpayers had to pay to bail out the banks in 2008 was equal to *23% of the entire U.S. budget* that year.  As alleged herein, Plaintiffs, like many others, became the victims of Countrywide's illegal and fraudulent appraisal and lending practices, and continue to be victimized to this day.

5.      Sadly, this story begins in 2005 when Plaintiffs lost their son in a tragic airplane accident due to the gross negligence of the plane's owner.  Plaintiff's son was a passenger in a small plane that never should have left the ground.

6.      Stricken with grief and unsophisticated in legal matters, Plaintiffs sought legal advice to explore their options in connection with the tragic and untimely death of their son.  Plaintiffs ended up hiring a law firm in Texas that assured Plaintiffs they had a good case and that their firm had the necessary experience and expertise to handle their case.  The law firm agreed to take Plaintiff's case on a contingent basis if Plaintiffs would pay the costs and expenses of litigating the case through trial.  When asked how much those expenses would be, the firm told Plaintiffs its costs and expenses would total around $170,000 through trial.  Plaintiffs believed they would be able to

2

find a way to afford this amount and so they entered into a retainer agreement with the law firm, which proceeded to file a case in Texas on behalf of Mr. Duff against the owner of the plane and several others.

7.      Soon thereafter, the law firm began requesting ever increasing amounts of money from Plaintiffs to cover the firm's claimed "expenses," which quickly became much higher than the law firm estimated or that Plaintiffs had anticipated.  Notwithstanding the law firm's representation about what the total costs and expenses would be to prosecute the case through trial, Plaintiffs were nevertheless required to pay over *1.3 million dollars* to the law firm in expenses over a five-year period while the case was being litigated, including hundreds of thousands of dollars for "Out-of-town travel," expensive meals by the attorneys, and jet fuel for the law firm's private jet.  Believing that if they did not keep up with paying these expenses, they would be abandoned by the law firm and lose everything they had spent thus far, Plaintiffs kept finding ways to earn enough money pay the large amounts of money the law firm kept demanding from them as "expenses."

8.      In 2006, in order to keep paying the law firm's exorbitant "expenses," Plaintiffs decided to see if they qualified for refinancing their home and property located at 2835 Gibraltar Road, Santa Barbara, California ("Residence") – a home which Plaintiffs had built with their own money and resources.  So, Plaintiffs contacted Countrywide at its office located at 801 Chapala Street, Santa Barbara, and proceeded to submit an application to Countrywide to see if they would qualify financially for refinancing their home (i.e., obtaining a larger mortgage loan secured by their Residence).  This process necessarily included having their Residence appraised to determine its then current value.  Based on Countrywide's appraisal, Plaintiffs qualified for a refinance of their home.  Plaintiffs also received a separate mortgage loan (the "Contiguous Property Loan") from Countrywide secured by a property contiguous with the Residence, located at 2690 Gibraltar Road (the "Contiguous Property"), which Plaintiffs had built to rent or sell.  Those mortgages allowed Plaintiffs to borrow a substantial additional amount of money in order to keep paying the law firm in Texas to prosecute the case on behalf of their deceased son's estate.

9.      After a jury trial, the estate of Charles Duff's son won the case on liability.  But in what can only be described as getting "home towned," the primary defendant and owner of the

1    plane, who lived in the town to which the case had been transferred, was only held liable for 4% of

2    the award, while an individual who had not been sued, and who was judgment proof in any event,

3    was held liable for the lion's share of the judgment.  As a result, Plaintiffs ended up with a relatively

4    modest judgment which amounted to only a fraction of what Plaintiffs ended up paying the Texas

5    law firm for its alleged "expenses."

6

7                                    **The Fraudulent Appraisal and Loan**

8          10.        When Plaintiffs decided to see if they qualified for a refinance of their Residence so

9    they could borrow some of the equity in their home to pay the Texas law firm so it would continue to

10   prosecute the negligence and wrongful death case on behalf of their deceased son, Countrywide sent

11   an appraiser out to the Duff's Residence to conduct an appraisal of the Residence.  On September

12   29, 2006, "Countrywide Home Loan/Landsafe" appraised Plaintiffs' Residence.  According to the

13   appraisal report created by Countrywide, the Countrywide appraiser inspected the Residence inside

14   and out and appraised the market value of the Plaintiffs' home and Residence at $2,850,000 ("First

15   Appraisal").

16         11.        Less than three weeks later, before Residence Loan closed and completely unknown

17   to Plaintiffs, Landsafe fabricated a second "secret" phony appraisal of the Residence.  This secret

18   phony "appraisal" placed a market value of $3,494,500 on Plaintiffs' Residence – a *$644,500*

19   *increase* over the original appraisal performed by Countrywide/Landsafe only three weeks earlier

20   ("Second Appraisal").  This Second "Appraisal" was obviously completely fabricated by Landsafe

21   and Countrywide (they just made up the numbers) since the appraiser named in the Second

22   Appraisal report never came to the Duffs' Residence to inspect it or appraise it as stated in the

23   report, nor did anyone else ever come to the house during this period of time to inspect it or appraise

24   the Residence.  This fact is beyond dispute since Plaintiffs' Residence is on the top of a steep hill

25   and is only accessible via a long, winding, and very steep driveway blocked off at the beginning of

26   the driveway by a steel entry gate that can only be opened electronically by Plaintiffs.  Plaintiffs

27   never let a second appraiser up to their Residence to inspect and appraise the Residence as

28

                                                          4

represented in the Second Appraisal report, and never let anyone into their house to perform a second appraisal as represented in the Second Appraisal report.

12.     Moreover, Plaintiffs were completely unaware that any such second "appraisal" of their Residence had ever taken place or even existed until years later when they saw a copy of the Second Appraisal in or about November of 2018 after it had been produced by the loan servicer pursuant to a request by Plaintiffs for certain documents related to their loan.  This occurred after Defendants initiated foreclosure proceedings on Plaintiffs' Residence and Charles Duff was forced to file for protection under Chapter 11 of the Bankruptcy Code.

13.     The phony Second Appraisal was completely fabricated by Countrywide and Landsafe and delivered to Countrywide's underwriters to provide support for Residence Loan amount of $1,850,000 (the "Residence Loan").  The phony Second Appraisal was also likely used to provide internal documentary support for the securitization of the Residence Loan, as well as support for the Residence Loan if there was ever an audit of Countrywide and its loans by state or federal authorities, or by insurance companies who needed to determine the value of the Countrywide loans which had been turned into mortgage backed securities before they insured them and Countrywide sold them off to Wall Street investors.

14.     This fraudulent scheme and illegal conduct by Countrywide and Landsafe was completely unknown by Plaintiffs until recently, but nevertheless resulted in Plaintiffs being burdened with a relatively high interest rate home mortgage Loan they did not actually qualify for, and which they eventually would not be able to afford to repay when the monthly mortgage payment ballooned from $10,406.25 a month, to $15,046.19 a month – *a 50% increase* in their monthly mortgage Loan payment.  After paying off the Duff's existing loan of $1,640,698.00, plus paying closing costs on the new Loan from Countrywide, the amount actually paid to the Duffs in cash from the new Loan was approximately $199,765.00.

15.     The loan Countrywide represented to Plaintiffs they qualified for was a loan whereby for the first 10 years of the loan, Plaintiffs were required to make interest only payments of $10,406.25 per month.  By 2016, ten years later, Plaintiffs had timely paid Defendants *over*

1786874.1 -- 32349.0001

1  *$1,248,750 in interest alone* on the loan, while the principal balance of their Loan *had not been*

2  *reduced by a single penny*!

3      16.    Starting in the 11th year – 2016 – Plaintiffs' monthly mortgage payment on the

4  Residence Loan began to include payments of *principal and interest*.  As a result, Plaintiffs' monthly

5  mortgage payment jumped from $10,406.25 a month to $15,046.25 a month.  As a further result, it

6  became increasingly difficult for Plaintiffs to make the monthly payments on the Residence Loan

7  and Contiguous Property Loan.  So, Plaintiffs contacted BofA, Countrywide's successor in interest,

8  to see if they could restructure or refinance the two loans, or get some kind of relief.  BofA told

9  Plaintiffs that they would only consider restructuring the loans if Plaintiffs were behind in their

10  monthly mortgage payments.  At the time, Plaintiffs were *not* behind in their monthly mortgage

11  payments on either loan, but were *current* and up to date.

12      17.    Based on BofA's representations to Plaintiffs, which Plaintiffs relied on, Plaintiffs

13  intentionally fell behind on their monthly mortgage payments on both loans by several months and

14  then contacted BofA and again asked if they could restructure the loans to make their monthly

15  payments more affordable as they were now behind on their monthly payments, which BofA had

16  represented to them would allow them to qualify for restructuring.  BofA responded by sending

17  Plaintiffs paperwork and an application.  Plaintiffs completed the paperwork and application and

18  sent it back to BofA, who proceeded to deny Plaintiffs' applications to have the loans restructured.

19      18.    As Plaintiffs' unpaid monthly mortgage payments and penalty fees piled up, BofA

20  kept sending Plaintiffs additional applications for restructuring, and Plaintiffs kept filling them out

21  and returning them to BofA hopeful they would be able to restructure and save the Residence and

22  Contiguous Property.  BofA kept denying Plaintiffs' applications to have the loans restructured

23  without giving Plaintiffs any meaningful explanation as to why they would not restructure the loans.

24  Eventually Defendants initiated foreclosure proceedings against Plaintiffs' Residence based on the

25  fraudulently obtained Loan, which resulted in Plaintiff Charles Duff filing a petition under chapter

26  11 of the Bankruptcy Code on November 12, 2018.

27

28

6

## **JURISDICTION AND VENUE**

19.     This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) and (b).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

20.     This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331.  This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law and common law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

21.     Venue lies within this judicial district under 28 U.S.C. § 1391(b), (c) and (d), and under 18. U.S.C. § 1965, because each of the Defendants has transacted business in this District and because a substantial part of the events or omissions giving rise to Plaintiffs' claims in this lawsuit occurred in this District.

## **PARTIES**

22.     Plaintiffs Charles Duff and Cathryn Duff are husband and wife and are citizens of the State of California residing on their Residence in Santa Barbara, California.  Charles Duff is the debtor and debtor-in-possession in the above-captioned bankruptcy case.

23.     Defendant Countrywide Financial Corporation ("Countrywide Financial") is a Delaware corporation registered to do business throughout the United States.  At all relevant times, Countrywide Financial was engaged in the business of mortgage lending through its family of companies which included Defendants Countrywide Home Loans and Countrywide Bank. Countrywide's mortgage lending business included originating, purchasing, securitizing, selling, and servicing residential mortgage loans.  At all relevant times, Countrywide Financial was the publicly traded parent and holding company of the Countrywide family of companies, whose principal place of business and headquarters is and was located at 4500 Park Granada, Calabasas, California.  In 2008, Countrywide Financial became part of BofA in the merger between Countrywide Financial and BofA as alleged herein.

7

24.     Defendant Countrywide Home Loans, Inc. ("Countrywide Home Loans") is a New York corporation with its principal place of business and national headquarters at 31303 Agoura Road, Westlake Village, California 91361.  At all relevant times, Countrywide Home Loans was a wholly owned and controlled subsidiary of Countrywide Financial and was in the business of originating mortgage loans.  In 2008, Countrywide Home Loans became part of BofA in the merger between Countrywide Financial and BofA.

25.     At all relevant times, Countrywide Home Loans operated a division called Full Spectrum Lending, Inc. ("FSL") which also had its headquarters at 4500 Park Granada, Calabasas, California.  FSL was devoted to sub-prime lending and, on December 2004, FSL was merged into Countrywide Home Loans and became one of its internal divisions.  In 2008, FSL became part of BofA in the merger between Countrywide Financial and BofA as alleged herein.

26.     Defendant Countrywide Bank, N.A. ("Countrywide Bank") is a national banking association headquartered at 1199 North Fairfax Street, Suite 500, Alexandria, Virginia 22314.  At all relevant times, Countrywide Bank was a wholly-owned and controlled subsidiary of Countrywide Financial and funded the loans originated by Countrywide Home Loans.  In 2008, Countrywide Bank became part of BofA in the merger between Countrywide Financial and BofA as alleged herein.

27.     Plaintiff is informed and believes that Defendants Countrywide Financial Corporation, Countrywide Home Loans and Countrywide Bank (referred to herein as "Countrywide") collectively devised, conspired with one another, and participated in the fraudulent appraisal and lending scheme alleged herein and all reaped enormous financial gain as a result of the fraudulent and unlawful conduct alleged herein.

28.     Defendant Bank of America Corporation ("BofA") is a Delaware Corporation, a bank holding company, and a financial holding company.  Its principal executive offices are located at 100 N. Tyron Street, Charlotte, North Carolina.  BofA conducts business throughout the State of California, including the County of Santa Barbara, and has numerous bank branches and lending facilities throughout the County of Santa Barbara.

1786874.1 -- 32349.0001

29.     On July 1, 2008, Countrywide Financial, and its subsidiaries including Countrywide Home Loans and Countrywide Bank, merged with Defendant BofA.  As a result, BofA became the successor-in-interest to the Countrywide family of businesses, including Countrywide Financial, Countrywide Home Loans and Countrywide Bank, and assumed liability for all of their unlawful conduct and liabilities as alleged herein.

30.     In the months following the merger, BofA executed a plan to integrate Countrywide's businesses into BofA through a series of transactions by which BofA would acquire control over all of Countrywide's operations.

31.     In April 2009, BofA informed the Federal Reserve that it would "run the combined mortgage business" under the "Bank of America brand" and that Calabasas, California, in Los Angeles County, would be the "the national headquarters for the combined mortgage business."

32.     BofA integrated the former mortgage-origination business of Countrywide Financial, including Countrywide Bank and Countrywide Home Loans, into its own mortgage business and externally branded it as "Bank of America Home Loans."  Countrywide employees became BofA employees, and BofA announced that it "ended up with the largest [mortgage] servicing platform in the country."

33.     An April 27, 2009 BofA press release noted that "[t]he Bank of America Home Loans brand represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans, which Bank of America acquired on July 1, 2008."

34.     In the months following the Countrywide-BofA merger, BofA executives and spokespersons made public statements that Countrywide's liabilities were factored into BofA's purchase of Countrywide, and that BofA intended to "clean[] up" those liabilities.

35.     In a 2008 interview with the New York Times, BofA's former CEO confirmed that "We looked at every aspect of the [Countrywide] deal, from their assets to potential lawsuits and we think we have a price that is a good price."

36.     On March 1, 2009, a BofA spokesperson stated that "We bought [Countrywide] and all of its assets and liabilities . . .  We are aware of the claims and potential claims against the company and have factored those into the purchase."

9

37.     Likewise, BofA's Form 10-K for 2009 acknowledges that "we face increased litigation risk and regulatory scrutiny as a result of the . . . Countrywide acquisitions."

38.     In November 2010, BofA's current CEO addressed potential litigation arising from Countrywide's operations and stated "[t]here's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, we will pay for the things that Countrywide did." One month later, he again confirmed to the New York Times that "Our company bought it and we'll stand up, we'll clean it up."

39.     Plaintiffs are informed and believe that, in addition to BofA's successor liability for Countrywide's conduct alleged herein, BofA also continued conduct alleged herein after its acquisition of Countrywide in July 1, 2008, and continued to actively concealed the fraudulent conduct for which it had assumed legal liability.

40.     Defendant LandSafe, Inc. ("LandSafe") is a Delaware corporation headquartered at 6400 Legacy Drive, Plano, Texas 75024.  LandSafe provides loan closing products and services such as credit reports and appraisals. At all relevant times, Landsafe was owned by Countrywide Financial.  BofA acquired LandSafe when it bought Countrywide Financial in 2008.  At all relevant times, LandSafe conducted business and performed real estate appraisals in the State of California, County of Santa Barbara.

41.     Defendant LandSafe Appraisal Services, Inc. ("LandSafe Appraisal") is a corporation that at all relevant times was headquartered at 6400 Legacy Drive, Plano, Texas 75024, and was a wholly-owned and controlled subsidiary of LandSafe, Inc. with whom it shared management and employees, offering appraisal services in connection with mortgage loan closings.  At all relevant times, Countrywide owned Landsafe Appraisal.   BofA acquired LandSafe when it bought Countrywide Financial in 2008.  LandSafe and LandSafe Appraisal are collectedly referred to herein as "LandSafe."   At all relevant times, LandSafe conducted business and performed real estate appraisals in the State of California, County of Santa Barbara.

42.     Defendant Bank of New York Mellon ("BONYM") is a corporation organized under the laws of New York.  At all relevant times, BONYM was headquartered in New York, New York and is currently headquartered at 240 Greenwich Street, New York, New York, 10007.  BONYM is

1786874.1 -- 32349.0001

named as a Defendant in its capacities as Trustee for the Certificate Holders of CWALT, Inc., Alternative Loan Trust 2006-HY3, Mortgage Pass-Through Certificates Series 2006-HY3 and as Trustee for the Certificate Holders of the CWALT, Inc. Alternative Loan Trust 2006-HY13, Mortgage Pass-Through Certificates, Series 2006-HY13.   Upon information and belief, BofA assigned its deeds of trust securing the Residence and the Contiguous Property to BONYM, and BONYM became BofA's successor-in-interest.

43.    Defendant Bayview Loan Servicing, LLC ("Bayview") is a limited liability company organized under the laws of Florida, and at all relevant times was headquartered at 4425 Ponce De Leon Boulevard, 5th Floor, Coral Gables, Florida 33146.   Bayview manages and/or services residential mortgage loans after they are originated by mortgage lenders.   At all relevant times, Bayview has conducted business and serviced loans in the State of California, County of Santa Barbara, including servicing the Residence Loan.

44.    Defendant NewRez LLC dba Shellpoint Mortgage Servicing ("Shellpoint") is a limited liability company organized under the laws of Pennsylvania, and headquartered in Greenville, South Carolina 29603.   Shellpoint manages and/or services residential mortgage loans after they are originated by mortgage lenders.   At all relevant times, Shellpoint has conducted business and serviced loans in the State of California, County of Santa Barbara, including servicing the Residence Loan.

## DOE DEFENDANTS

45.    The true names of Defendants sued herein as Does 1 through 10 ("Doe Defendants") are either unknown to Plaintiffs or their specific role in the unlawful and wrongful conduct, scheme, and enterprise alleged herein, or their successor liability for such conduct, is presently known only by Defendants, and therefore Plaintiffs sue the Doe Defendants by such fictitious names.   Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of the Doe Defendants at such time as they have been ascertained.   Plaintiffs believe they will be able to identify Doe Defendants after appropriate discovery has been completed.

11

1786874.1 -- 32349.0001

46.    The Doe Defendants may include, but are not limited to, the directors, officers, managers, employees, agents, representatives, auditors, underwriters, broker/dealers, affiliates and/or other persons or entities who engaged in, assisted, aided and abetted, or conspired with any of the Defendants and/or Doe Defendants in the commission of any part of the unlawful conduct, scheme, and/or enterprise alleged herein.

47.    The term "Defendants" shall also mean and include the plural and singular, and will include all of the Defendants (as defined in the Preamble), and any of them individually.

## **ALLEGATIONS OF CONCERTED ACTION**

48.    At all relevant times, Defendants pursued a common course of conduct, acted in concert with one another, conspired with one another to accomplish the offenses complained of herein, and/or performed acts and made statements in furtherance thereof.    In addition to the wrongful conduct alleged herein, which gives rise to Defendants' primary liability, Defendants further aided and abetted and knowingly assisted one another in perpetrating the illegal and wrongful conduct alleged herein.

49.    Whenever this complaint alleges an act, deed or transaction by a corporation, partnership, or other business entity, the allegation means that the corporation, partnership, or other business entity engaged in the act, deed or transaction by or through its owners, partners, directors, officers, managers, employees, agents, and/or representatives while acting within the course and scope of their employment, partnership or agency; were actively engaged in the management, direction, and/or control of the entity; and/or were transacting the entity's ordinary business or its affairs.

50.    Whenever in this Complaint reference is made to any act, deed, or conduct of Defendants committed in connection with the alleged enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

12

**THE DISCOVERY RULE**

51.     Any applicable statutes of limitations concerning Plaintiffs' claims did not accrue (begin to run) until very recently, if at all, as a result of the application of the "discovery rule," which postpones the accrual of a claim until the plaintiff discovers, or a reasonably diligent plaintiff would have discovered, "the facts constituting the violation." *Merck & Co. v. Reynolds* (2010) 559 U.S. 633, 653.  In fact, Plaintiffs did not discover, or have reason to discover, the facts which have provided a basis for their claims against Defendants as alleged in this complaint until, at the very earliest, November of 2018, when Plaintiffs first discovered the phony Second Appraisal Countrywide and Landsafe had created for their Residence and Loan.  It was not until this time that Plaintiffs became aware of any facts concerning Defendants' fraudulent and unlawful conduct with respect to their own Loan as alleged herein, and this occurred *after* Charles Duff had filed for protection under Chapter 11 of the Bankruptcy Code on November 12, 2018.

**THE AUTOMATIC STAY**

52.     The filing of the Chapter 11 proceeding by Plaintiff Charles Duff on November 12, 2018, operated as a stay of any action by the debtor in possession pursuant to 11 U.S. Code § 362 with respect to pursuing any claims against Defendants or anyone else, pending further investigation by Plaintiffs, and pending qualification and permission by the Bankruptcy Court to find and hire counsel qualified to pursue such claims on behalf of the debtor in possession.

**TOLLING BY THE *WALDRUP* CLASS ACTION**

53.     On November 27, 2013, Plaintiff Barbara Waldrup filed a class action complaint against Defendants in the United States District Court for the Central District of California.  The case was *Waldrup v. Countrywide Financial Corporation et al*, Case No. 2:13-cv-08833-CAS-AGR (hereinafter "*Waldrup*").  The class Ms. Waldrup alleged was comprised of "All residents of the United States of America who, during the period January 1, 2003 through December 31, 2008, obtained an appraisal from LandSafe in connection with a loan originated by Countrywide."  On February 6, 2018, the Court certified a nationwide class in *Waldrup*.

13

1786874.1 -- 32349.0001

54.    As alleged herein, Plaintiffs obtained an appraisal from Landsafe in 2006 in connection with their Loan that was originated by Countrywide.   As a result, Plaintiffs were members of the class in *Waldrup*.   As a further result, the filing of the *Waldrup* action on November 27, 2013, tolled the running of the applicable statutes of limitation for all members of the *Waldrup* class pursuant to *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 449-50 (1974) and its progeny, to the extent such statutes of limitation had even begun to run for Plaintiffs since they had not yet discovered any facts which would have provided a basis for their claims against Defendants as alleged in this Complaint.

55.    In addition, much of the material facts and evidence filed in the *Waldrup* action on various motions was filed by Defendants under seal and remains under seal, and so has not been available to Plaintiffs or other members of the *Waldrup* certified class, and remains unknown and unavailable to them.

## EQUITABLE TOLLING, EQUITABLE ESTOPPEL,
## AND FRAUDULENT CONCEALMENT

56.    Prior to November 27, 2013 when Waldrup filed her class action complaint which tolled the applicable statutes of limitations for all class members, relevant and material facts and information concerning the fraudulent appraisal scheme and lending practices of Defendants were actively and intentionally concealed by Defendants, and were not known by anyone other than Defendants, and in fact continue to be actively and intentionally concealed by Defendants.

57.    Under the principles of equitable tolling, a statute of limitations will not bar a claim in a case where the plaintiff, despite reasonable diligence, could not or did not discover material facts about their injury or fraudulent conduct until after the expiration of the limitations period, and the defendant already had notice of the claim

58.    Here, Plaintiffs were completely ignorant of any information or facts required for the discovery of their claims without any fault or lack of diligence on their part, and Plaintiffs did not suspect, or have reason to suspect, a factual basis for their claims against Defendants, nor did they discover, or by reasonable diligence should have discovered, the existence of the fraudulent and

14

1  unlawful conduct alleged herein any sooner than they did, and so to the extent any applicable

2  statutes of limitations had started to run, they were equitably tolled.  As a further result, Defendants

3  are estopped from relying on any applicable statutes of limitation as a defense in this action due to

4  their ongoing fraudulent concealment of the phony appraisals and other fraudulent and unlawful

5  conduct as alleged herein.

6

7                                **FACTUAL BACKGROUND**

8                                **Real Estate Appraisal Standards**

9         59.      A property appraisal by a licensed and qualified professional is a critical and required

10 component of any real estate loan transaction.  It provides the borrower and lender with a means of

11 obtaining an up-to-date expert opinion on the value of the property from a licensed and qualified

12 specialist based on, among other things, a detailed inspection of the property and by comparing

13 recent sales of comparable properties in the area based on a number of reliable and established

14 metrics.  Appraisals are also required to provide protection to the federal government (and therefore

15 the taxpayer) when lenders, like Countrywide and BofA, originate millions of mortgage loans each

16 year that are federally-insured by the government.  As a result, property appraisals are extremely

17 important in most mortgage loan transactions and are governed by a number of laws, regulations and

18 professional standards.

19        60.      In 1989, Congress adopted Title XI of the Financial Institutions Reform, Recovery,

20 and Enforcement Act of 1989 ("FIRREA").  *See* 12 U.S.C. §§ 3331 *et seq.* (hereafter "Title XI").

21 Title XI *requires* federally-insured financial institutions like Countrywide and BofA to obtain a

22 written appraisal that strictly conforms to USPAP standards in connection with any real property

23 insured by the Federal Housing Administration ("FHA").  *See* 12 U.S.C. § 1708(f).  Federal law also

24 requires that such appraisals "be performed in accordance with uniform standards, by individuals

25 who have demonstrated competence and whose professional conduct is subject to effective

26 supervision."  *Id.* at § 1708(f)(1).  Additionally, such USPAP appraisals "shall be performed in

27 accordance with generally accepted appraisal standards," and each appraisal is to be a written

28 statement that is "independently an[d] impartially prepared by a licensed or certified appraiser

                                               15

setting forth an opinion of defined value of an adequately described property as of a specific date, supported by presentation and analysis of relevant market information." 12 U.S.C. § 1708(f)(1)(A), (B).

61.    The USPAP requires appraisers to conduct their appraisals independently and competently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser *must not perform as an advocate for any party or issue*." (USPAP Ethics Rule, emphasis added.) USPAP rules also provide that "[a]n appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions." *Id.*

62.    The USPAP also requires that an appraiser communicate the result of an appraisal in a manner "that is not misleading." The purpose of this rule is to ensure that "the client and any intended users *whose expected reliance on an appraisal* may be affected by the extent of the appraiser's investigation *are properly informed and are not misled* as to the scope of work." *Id.* (emphasis added). In this regard, the appraiser's "scope of work" must include the research and analyses necessary to develop credible assignment results. To that end, an appraiser must not "exclude any information or procedure that would appear to be relevant to the client, an intended user, or the appraiser's peers in the same or a similar result." *Id.* Additionally, an appraiser "must not allow assignment conditions or other factors to limit the extent of research or analysis to such a degree that the resulting opinions and conclusions developed in an assignment are not credible in the context of the intended use of the appraisal." *Id.*

63.    The USPAP further provides that it is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

a.    the reporting of a predetermined result (e.g., opinion of value);

b.    a direction in assignment results that favors the cause of the client;

c.    the amount of a value opinion;

d.    the attainment of a stipulated result; or

16

e.    the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

64.    In addition, each USPAP appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client. *Id.*

65.    The USPAP standards are incorporated into federal law, 12 C.F.R. § 34.44. Such law provides that an in-house or staff appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "fee" appraisers, the regulation similarly requires that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45.

66.    Appraisers and appraisals are also regulated by state laws, including California Civil Code Section 1090.5 which provides, in pertinent part, that: "(a) No person with an interest in a real estate transaction involving a valuation shall improperly influence or attempt to improperly influence the development, reporting, result, or review of that valuation, through coercion, extortion, bribery, intimidation, compensation, or instruction."

**The Importance of Compliant, Honest and Reliable Appraisals**

67.    Obtaining an honest, accurate and reliable appraisal fully compliant with applicable laws, rules and regulations is a critical element of the home buying or refinancing process because it provides a homeowner or prospective buyer with a reasonably accurate, objective and supportable expert opinion of a property's market value, and provides a basis for evaluating the equity in the property that will provide a basis for securing and providing credit support for the loan. This process also protects the financial and public policy interests in real estate transactions that involve federally-regulated and federally-insured institutions like Countrywide and BofA. In this regard, Title XI of

17

the Financial Institutions Reform Act of 1989 ("FIRREA") *requires* financial institutions like Countrywide and BofA to obtain regulated appraisals, performed in strict compliance with USPAP's ethical and competency requirements, in connection with the sale or refinancing of property.

68.     At the heart of applicable federal and state laws, as well as the ethics and competency rules of USPAP, is the requirement that professional appraisers be fully independent and objective in reaching their opinions concerning a property's value.

## An Insider Blows the Whistle on Countrywide and its Fraudulent
## Appraisal and Lending Practices

69.     On May 13, 2009, an insider and whistleblower named Kyle Lagow ("Lagow") filed a sealed complaint against Countrywide, LandSafe, BofA and others for damages and civil penalties under the False Claims Act in the United States District Court for the Eastern District of New York. In May of 2012, Lagow's complaint was finally unsealed and the general outlines of Defendants' phony appraisal and lending schemes were disclosed to a limited number of people.

70.     Lagow's unsealed complaint contains general information about his first-hand personal knowledge of Defendants' corrupt appraisal and lending practices and other unlawful conduct.  According to Lagow, from June 2004 until November 2008, Lagow was employed by LandSafe, Inc. in Plano, Texas as one of the company's original supervisory home appraisers.  He was promoted to Field Valuation Manager, then Area Manager, and ultimately to Assistant Vice President, Area Appraisal Manager.

71.     Lagow's unsealed complaint alleged that during his tenure at LandSafe, he had direct exposure to and personal knowledge of the false statements, records and/or claims made by LandSafe, its affiliate Countrywide Home Loans, FSB, Countrywide Bank and their parent Countrywide Financial.  According to Lagow, he witnessed first-hand Defendants' corruption of the appraisal process in a variety of ways, including, but not limited to: (1) knowingly and fraudulently inflating, and causing inflation of property appraisals for Countrywide's home loans, (2) refusing to supply bona fide appraisers with documents and other materials that were necessary for performing honest appraisals; (3) paying above-market fees to those appraisers who agreed to disregard or

ignore the legal requirements for independent appraisers in contravention of the law; (4) rewarding appraisers who produced corrupt appraisals and appraisal reviews with as many as 400 new appraisals per month; (5) blacklisting, retaliating against, auditing, and firing appraisers who refused to provide the appraisal reports and valuations Defendants wanted; (6) requiring appraisers to rely upon information outside the relevant market area in order to justify manipulated valuations for the subject appraisals; (7) providing appraisers with false sales information, including not reflecting concessions made by sellers at the time of closing, and corrupting the use of legitimate comparables to complete appraisal reports; and (8) retaliating against persons who questioned or criticized Defendants' practice of preparing or approving phony appraisal reports.

72.     According to Lagow's unsealed complaint, LandSafe utilized two primary methods for obtaining the fraudulent appraisal values it needed to perpetuate Countrywide's fraudulent appraisal scheme.  First, it would assign appraisal requests for Countrywide wholesale or retail loans to either outside "fee" appraisers or its "staff" appraisers.   The outside "fee" appraisers were pressured to "play ball" and cooperate with Defendants' appraisal "requirements" through a variety of means and methods including threats of black listing.  Staff appraisers were directly pressured by their employer Landsafe to produce illegitimate and fraudulent appraisals that would allow Countrywide to loan as much money as possible to the borrower in order to (i) keep the total dollar value of the loans it was originating as high as possible, (ii) fill up its mortgage-backed securities pipeline to Wall Street which demanded an ever increasing number and dollar amount of new loans, and (iii) satisfy its ever increasing need for more revenue and profits.

73.     Second, it would "review" all appraisals for Countrywide loans ostensibly as a quality control measure.    In reality, its "review" mechanism was a sham created by Defendants to: (1) create the illusion it had a robust underwriting process it used to verify property values; (2) allow for rewriting and inflating any appraisal that, if left as it was, would have prevented the loan from closing for failure to meet underwriting standards; and (3) allow Defendants to market this sham "review" mechanism and thereby mislead the investing public and regulators into believing Countrywide's loan assets were more secure and less in need of oversight or review.

19

74.    According to Lagow's unsealed complaint, when he started working at LandSafe in 2004, he was immediately placed in a supervisory position over a team of staff appraisers whose primary purpose was to perform appraisals on loans originated by Countrywide.  His responsibility was to hire and train new staff appraisers in multiple states and to directly supervise these appraisers in their completion of appraisals on Countrywide loans.  During his tenure at LandSafe, Lagow opened new markets for the company, hiring teams of appraisers to handle Countrywide's loans across a number of states.

75.    As a supervising appraiser and ultimately Assistant Vice President and Area Manager, Lagow was involved in many communications between the LandSafe staff appraisers and Countrywide.  He was also directly involved in communications between Countrywide loan originators, through LandSafe, to fee appraisers.  In addition, Lagow was given a supervisory position over so-called review appraisers.

76.    According to Lagow's unsealed complaint, early in his tenure at LandSafe, he personally observed Countrywide and LandSafe's manipulation of the appraisal process, a manipulation intended to help fill Countrywide's mortgage origination pipeline for mortgage-backed securities.  For example, in early 2005, Lagow attended a meeting with LandSafe President Todd Baur and a group of other appraisal managers.  Baur told the appraisal managers, including Mr. Lagow that: (1) that they needed to quit thinking of an appraisal as a separate unit; (2) LandSafe appraisers were there to help facilitate a Countrywide loan closing; and (3) they needed to change their thought process, the clear implication being that they needed to stop thinking like appraisers and think instead like lenders trying to close a loan.  Lagow and his colleagues came to understand from Baur that the appraisal manager's job at LandSafe was to make sure that appraisals were as high as possible and did not hinder or impede Countrywide's loan origination and securitization pipeline.

77.    By early 2006, Lagow had identified that Countrywide and LandSafe were exerting substantial influence and control over the home valuation process which was resulting in manipulated and substantially inflated appraisal values which, in turn, led to routinely inflated

20

1  mortgage loans with actual loan-to-value ratios as high as 115% -- far above the 97% permitted by

2  the FHA insurance program, all of which would eventually lead to increased foreclosures.

3      78.    According to Lagow, just prior to his termination in late 2008, he learned of a

4  formal internal audit of LandSafe's fraudulent appraisal practice conducted by a Senior Vice

5  President at LandSafe. *The audit found that the appraisals conducted by LandSafe were pre-textual*,

6  and the appraisal reports *always communicated an inflated value necessary for Countrywide to close*

7  *a loan*.  Despite these internal audit results, LandSafe continued its practice of systematically

8  preparing and charging for fraudulent and inflated appraisals at Countrywide's request.

9

10              **Countrywide's Fraudulent Appraisal Scheme**

11     79.    Commencing in 2003, Countrywide produced hundreds of billions of dollars   in

12  loans annually and had a residential mortgage servicing portfolio in excess of $1 trillion.

13     80.    Countrywide originated mortgages through its retail operations, primarily branded as

14  "Countrywide Home Loans," where Countrywide acted as the loan broker (through Countrywide

15  Home Loans) and the lender (through Countrywide Bank).   Countrywide also had a large on-line

16  mortgage origination business and, through an entity called Full Spectrum Lending, Inc. ("FSL"),

17  engaged in sub-prime lending.

18     81.    As the real estate market grew exponentially during the early 2000's, Countrywide's

19  lending and loan servicing business grew rapidly.  By 2004, Countrywide had become the largest

20  mortgage lender in the United States.  To fuel its appetite for profit, Countrywide began loosening its

21  underwriting efforts to rapidly close and sell loans to the secondary market.   To that end,

22  Countrywide viewed the appraisal process as a speed bump in the road to closing a loan.

23     82.    From at least 2004 and continuing through at least 2007, Countrywide maintained a

24  database entitled "Field Review List" which contained the names of "independent" appraisers who

25  were blacklisted by Countrywide because they refused to participate in the fraudulent scheme.  To

26  further address the "problem" of "independent" appraisers impeding Countrywide's ability to rapidly

27  originate and sell loans, Countrywide targeted and developed an affiliation with LandSafe.  Through

28  LandSafe, Countrywide could (1) use its market size to pressure appraisers to disregard the appraisal

21

1    "independence" requirements and permit Countrywide to rapidly close a loan; (2) punish appraisers

2    who refused to "play ball;" and (3) use fraudulent appraisal "reviews" to revise legitimate appraisals

3    to arrive at values needed to close a loan.  Indeed, given Countrywide's significant mortgage lending

4    business, LandSafe had a strong financial incentive to play by Countrywide's rules.

5

6                        **Countrywide's Fraudulent Appraisal Process**

7            83.    Because a legally-mandated USPAP appraisal had the potential to delay or terminate

8    a prospective loan transaction, and thus limit Countrywide's ability to securitize and sell such loans

9    to Wall Street on a large and rapid scale, Countrywide opted for a different but fraudulent and

10   unlawful course of action.

11           84.    As part of the lending transaction, Countrywide required that borrowers use LandSafe

12   as its "approved" USPAP appraisal vendor.   In reality, LandSafe was Countrywide's captive,

13   wholly-owned subsidiary over which Countrywide exerted complete dominion and control.  Through

14   LandSafe, Countrywide controlled the process and outcome of the so-called USPAP appraisal, a fact

15   never disclosed to prospective borrowers and homeowners.

16           85.    Countrywide conspired with LandSafe and agreed to, among other things, knowingly,

17   fraudulently, and systematically produce phony so-called USPAP "appraisals" on home loans

18   originated by Countrywide which were not performed in accordance with required USPAP and other

19   appraisal standards, and were often simply made up so Countrywide could fill its monthly goals and

20   quotas for the dollar amount of new loans generated each month.

21           86.    In furtherance of their fraudulent scheme, LandSafe and Countrywide intentionally

22   engaged in systematic and unlawful conduct with respect to the preparation and dissemination of

23   appraisals for Countrywide loans originated between 2004 and 2008.  This scheme was designed to

24   ensure that its appraisal reports contained an inflated or manipulated property "value," so that this

25   "value" would exceed the Countrywide loan amount regardless of the true value of the property.

26   LandSafe and Countrywide engaged in this fraudulent and unlawful scheme by, among other things:

27           •    refusing to utilize bona fide, independent appraisers to prepare legally mandated

28                USPAP appraisals;

                                              22

- paying generous fees to, and otherwise rewarding, a select list of appraisers who agreed to disregard USPAP's ethical and competency rules;

- paying generous fees to, and otherwise rewarding, a select list of appraisers who agreed to inflate property values and participate in the fraudulent scheme;

- blacklisting and otherwise retaliating against appraisers who refused to disregard the requirements of the USPAP appraisal process, refused to inflate property values, and/or who refused to otherwise participate in the fraudulent scheme; and

- withholding information from appraisers to ensure the creation of phony appraisals.

87.    In effect, through their widespread practice of systematically corrupting the appraisal process with fraudulent and highly inflated appraisals, Defendants created so-called "appraisal reports" which were *not* legitimate estimates of a property's real value, but rather were fraudulent reports of grossly inflated values that enabled Countrywide to rapidly close loans that were much larger than borrowers could actually afford, but which enabled Countrywide to keep its pipeline of over-valued mortgage loans flowing so it could bundle up these mortgage loans into mortgage backed securities and sell them to Wall Street and unsuspecting investors for enormous profits and annual bonus payments.

88.    Although obtaining an USPAP appraisal was an obligation imposed by law on Defendants, they nevertheless charged borrowers for their appraisals at inflated costs, notwithstanding the fact that Countrywide and LandSafe falsely represented to borrowers that they had performed legitimate "appraisals" on their properties which complied with applicable legal and ethical USPAP requirements and then demanded that borrowers *pay* between $300 and $600 for these so-called USPAP "appraisals" – in effect charging borrowers a premium for legally-mandated USPAP appraisals that were never actually performed.  The end result for those who borrowed from Countrywide was that they often ended up with a loan that at some point they could not afford to repay on a monthly basis, or if they tried to sell their home to pay off the loan, they were unable to do so since the value of the home was often less that the amount they had borrowed from Countrywide based on the phony appraisals created by Countrywide and Landsafe.

23

**Defendants Defraud Plaintiffs**

89.    In or about September of 2006, Plaintiffs decided to see if they qualified for a refinance of their Residence.  If they qualified and were able to refinance their Residence, they thought they would be able to borrow sufficient funds to pay the costs and expenses of the law firm in Texas so the law firm would continue to pursue the action against the owner of the plane for negligence and wrongful death on behalf of their son's estate.

90.    As a result, Plaintiffs contacted Countrywide at its office located at 801 Chapala Street, Santa Barbara, and proceeded to make inquires and submit information to Countrywide to see if they qualified for a refinance their home (i.e., obtaining a larger mortgage loan secured by their Residence).  This process included providing information to Countrywide, filling out and signing applications, forms and paperwork, and having their Residence appraised by Countrywide and Landsafe to determine its then current value.

91.    The documents Plaintiffs received from Countrywide were standard form statements or agreements prepared by Countrywide or LandSafe's which were often printed on their letterhead and stationary with corporate logos.  These documents included certain Disclosure Statements, Good Faith Estimates, and HUD-1 Settlement Statements in connection with the Residence Loan.

92.    As federally-insured and federally-regulated financial institution Countrywide was required to obtain a USPAP appraisal in connection with the Residence Loan transaction.  Among other things, and in furtherance of Defendants' unlawful appraisal and lending scheme, LandSafe prepared a document for Plaintiffs entitled "Uniform Residential Appraisal Report" on Plaintiffs' Residence (the "First Appraisal") which represented that it had been prepared "in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) as approved by the Appraisal Standards Board of the Appraisal Foundation; the requirements to Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989 (FIRREA); the Uniform Standards of Professional Appraisal Practice and the Code of Professional Ethics of the Appraisal Institute; all applicable state licensing and certification requirements; and all applicable Supplemental Standards."

93.     Countrywide sent an appraiser out to the Duff's Residence to conduct an appraisal of the Residence.  On September 29, 2006, "Countrywide Home Loan/Landsafe" appraised Plaintiffs' Residence.  According to the appraisal report created by Countrywide/Landsafe, the appraiser inspected the Residence inside and out and appraised the market value of the Plaintiffs' home and Residence at $2,850,000 ("First Appraisal").

94.     Countrywide/Landsafe sent or transmitted the First Appraisal from its office in Santa Barbara, California to, among other Defendants, Landsafe's offices in Plano, Texas, and from Plano, Texas to Countrywide Home Loans in Calabasas, California via U.S. Mail and/or via an interstate carrier such as Federal Express.  Countrywide and/or Landsafe then transmitted the First Appraisal to Plaintiffs via U.S. Mail and/or via an interstate carrier such as Federal Express.

95.     Less than three weeks later, before the Residence Loan closed, but completely unknown to Plaintiffs, after Countrywide/Landsafe had conducted the First Appraisal and placed a value on Plaintiffs' Residence of $2,850,000, Countrywide/Landsafe completely fabricated a second "secret" phony appraisal on Plaintiffs' Residence.  This secret phony "appraisal" magically increased the market value of Plaintiffs' Residence by $644,500 to *$3,494,500* without anyone actually inspecting or appraising Plaintiffs' Residence.   The numbers is this second "appraisal" were obviously fabricated and completely "made up" by Landsafe and Countrywide since the appraiser named in the Second Appraisal report never came to the Duffs' Residence to inspect or appraise their Residence as stated in the appraisal report, nor did anyone else ever come to the house during this period of time to reinspect it or appraise the Residence.  Plaintiffs' Residence is on the top of a steep hill and is only accessible via a long, winding, and very steep driveway that is blocked off at the beginning of the driveway by an entry gate that can only be opened electronically by Plaintiffs. Plaintiffs never let a second appraiser up to their Residence to inspect and appraise the Residence as represented in the Second Appraisal report, and never let anyone into their home to perform a second appraisal as represented in the Second Appraisal report.

96.     Moreover, Plaintiffs were completely unaware that any such second "appraisal" of their Residence had ever taken place or even existed until many years later when they saw a copy of

the Second Appraisal in or about November of 2018 after it had been produced by Shellpoint, the loan servicer, pursuant to a request by Plaintiffs for certain documents related to their Loan.

97.    The phony Second Appraisal was completely fabricated by Countrywide and Landsafe and was created by Countrywide for its underwriters to provide support for the Residence Loan amount of $1,850,000.  The phony Second Appraisal was also used to provide documentary support for the securitization of the Residence Loan, as well as support for the Residence Loan if there was ever an audit of Countrywide and its loans by state or federal authorities, or by insurance companies who needed to determine the value of the Countrywide loans which were bundled, securitized, and converted into mortgage backed securities, before they were sold off to Wall Street investors by Countrywide.

98.    Like the First Appraisal, this Second "Appraisal represented it had been prepared "in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) as approved by the Appraisal Standards Board of the Appraisal Foundation; the requirements to Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989 (FIRREA); the Uniform Standards of Professional Appraisal Practice and the Code of Professional Ethics of the Appraisal Institute; all applicable state licensing and certification requirements; and all applicable Supplemental Standards."  These statements and representations were obviously false when made. Moreover, they were part of the fraudulent appraisal and lending scheme by Defendants as alleged herein.

99.    Countrywide/Landsafe sent or transmitted the Second fraudulent Appraisal to, among others, Landsafe in Plano, Texas via U.S. Mail, and/or via an interstate carrier such as Federal Express, and subsequently to others including Shellpoint via U.S. Mail, and/or via an interstate carrier such as Federal Express.

100.    The Second Appraisal was clearly illegitimate, unsupported and violated USPAP, Title XI, FIRREA, FHA requirements, and state law, among others, because it was fraudulent and completely made up, which was part and parcel of Defendants' practice of systematically corrupting the appraisal process in connection with loans originated by Countrywide, by producing so-called "appraisal reports" which were not legitimate opinions of the value of the property being appraised.

Rather, they were reports of a predetermined value that advanced Countrywide's scheme to unlawfully create appraisal reports that contained inflated or manipulated property "values" which exceeded the Countrywide loan amount regardless of the true value of the property, so it could continue to rapidly originate and close loans to fill up its ever expanding and highly profitable mortgage-backed securities pipeline to Wall Street, which on average generated over $10 billion per year in mortgage-backed securities, and tens of millions in profits and bonus payments.

101.    This fraudulent scheme and illegal conduct by Countrywide and Landsafe were completely unknown by Plaintiffs until they discovered the phony second appraisal in November of 2018.  Defendants' fraudulent scheme and unlawful conduct resulted in Plaintiffs being burdened with a relatively high interest rate mortgage Loan which they could ill afford and which they were not really properly qualified for, and which they would eventually not be able to afford when the monthly mortgage payment ballooned from $10,406.25 a month, to $15,046.19 a month – *a 50% increase* in their monthly mortgage Loan payment.

102.    The Loan Countrywide told Plaintiffs they qualified for and offered Plaintiffs was a loan whereby for the first 10 years of the loan, Plaintiffs were required to make interest only payments of $10,406.25 per month.  By 2016, ten years later, Plaintiffs had timely paid Defendants *over $1,248,750 in interest alone* on the loan, while the principal balance on their Loan *had not been reduced by a single penny*!

103.    Starting in the 11th year – 2016 – Plaintiffs' monthly mortgage payment began to include payments of *principal and interest*.  As a result, Plaintiffs' monthly mortgage payment ballooned from $10,406.25 a month to $15,046.25 a month.  As a further result, it immediately became much more difficult for Plaintiffs to make the monthly payments on their mortgage Loan.  To address this problem, Plaintiffs contacted BofA, Countrywide's successor in interest, to see if they would be willing to restructure or refinance the Residence Loan, or if Plaintiffs could get some kind of relief.  In response, BofA told Plaintiffs that they would only consider restructuring the Residence Loan if Plaintiffs were behind in their monthly mortgage Loan payments.  At the time, Plaintiffs were <u>not</u> behind in their monthly mortgage payments on the Residence Loan, and were *current* and up to date on their monthly mortgage payments on the Residence Loan.

27

104.    Based on BofA's representations to Plaintiffs, which Plaintiffs relied on, Plaintiffs intentionally fell behind on their monthly mortgage payments by several months and then contacted BofA and again asked if they could restructure their Loan to make their monthly payments more affordable since they were now behind on their monthly mortgage payments on the Residence Loan. BofA responded by sending Plaintiffs paperwork and an application.  Plaintiffs completed the paperwork and application and sent it back to BofA, who proceeded to deny Plaintiffs application to have their Loan restructured.

105.    As Plaintiffs' unpaid monthly mortgage payments and penalty fees quickly piled up, BofA kept sending Plaintiffs additional applications to have their Loan restructured, and Plaintiffs kept filling them out and returning them to BofA, and BofA kept denying Plaintiffs' applications to have their Loan restructured without giving Plaintiffs any meaningful explanation.  BofA's statements to Plaintiffs and its repeated sending of applications were a representation that BofA would negotiate with Plaintiffs in good faith over modifications.  But BofA utterly failed to negotiate a mortgage modification in good faith, or indeed to meaningfully engage with Plaintiffs at all. Defendants then initiated foreclosure proceedings against Plaintiffs' Residence based on the fraudulent appraisal and Loan, all of which eventually resulted in Plaintiff Charles Duff filing for protection under Chapter 11 of the Bankruptcy Code on November12, 2018.

106.    On February 27, 2019, Defendant BONYM, by and through Bayview, filed Proof of Claim No. 8, asserting a secured claim in the amount in the amount of $1,577,821.16 arising from the Contiguous Property Loan.  On February 28, Defendant BONYM filed Proof of Claim No. 9, asserting a secured claim in the amount in the amount of $2,159,177.90 arising from the Residence Loan.

### FIRST CLAIM FOR RELIEF
**Violation of Unfair Competition Law**
**(California Business & Professions Code §§ 17200 *et seq.*)**

107.    Plaintiffs incorporate by reference in this claim for relief each and every allegation in paragraphs 1 through 106 above as though set forth herein *in haec verba*.

1786874.1 -- 32349.0001

108.   California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice."  Based on the facts alleged above, Defendants have engaged in unfair and/or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200 *et seq*.

109.   By means of the unlawful, unfair and/or fraudulent business acts and practices alleged herein, Defendants have (1) directly and indirectly employed a scheme, device and artifice to defraud and mislead and defraud Plaintiffs; (2) directly and indirectly engaged in an unfair and deceptive acts towards Plaintiffs; (3) directly and indirectly obtained property and money by fraud and misrepresentation; and (4) knowingly made published and disseminated false, deceptive and misleading statements and information.

110.   The actions and decisions of Defendants as alleged herein emanated from and occurred within the State of California.  As a result, California law applies to the claims of Plaintiffs. Defendants planned and implemented their wrongful scheme in California and many of the wrongful acts emanated from Countrywide's California offices.

111.   Defendants' conduct as alleged and described herein constitutes an unlawful business practice within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*. in that the conduct violates, among other laws, the Racketeering Influenced and Corrupt Practice Act ("RICO"), the Real Estate Settlement Procedures Act of 1974 ("RESPA"), California Civil Code section 1090.5, and the common law of fraud and unjust enrichment, among other laws.  Specifically, as alleged herein, Defendants have:

- Violated 18 U.S.C. § 1962(c) by conducting the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interested commerce through a pattern of racketeering activity, and engaged in a conspiracy in violation of 18 U.S.C. § 1962(d) as alleged herein;

- Violated 18 U.S.C. §§ 1341 and 1343, the mail and wire fraud statutes invoked by 18 U.S.C. § 1961(1) as predicate acts, where § 1343 provides in relevant part: "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

29

representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice …"

- Violated 12 U.S.C. § 2607(a)-(c), Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2 by referring appraisal settlement services business to LandSafe (1) in exchange for control over the appraisal valuation process; and (2) without making the disclosures required by RESPA as alleged herein;

- Violated 12 U.S.C. § 2607(b) and Regulation X, 24 C.F.R. § 3500.14, by charging inflated appraisal fees for appraisals that were never properly conducted, or never conducted at all, as alleged herein;

- Violated Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") by influencing, coercing and manipulating the appraisal process as alleged herein;

- Violated the National Housing Act, as amended, by influencing, coercing and manipulating the appraisal process in connection with FHA-backed loans;

- Engaged in acts prohibited by California Civil Code section 1090.5, including: (1) "[s]eeking to influence a person who prepares a valuation to report a minimum or maximum value for the property being valued," Cal. Civ. Code § 1090.5(a)(1); (2) "[w]ithholding or threatening to withhold timely payment to a person or entity that prepares a valuation, or provides valuation management functions, because that person or entity does not return a value at or above a certain amount," *id.* at § 1090.5(a)(2); (3) "[i]mplying to a person who prepares a valuation that current or future retention of that person depends on the amount at which the person estimates the value of the real property," *id.* at § 1090.5(a)(3); (4) "[e]xcluding a person who prepares a valuation from consideration for future engagement because the person reports a value that does not meet or exceed a predetermined threshold," *id.* at § 1090.5(a)(4);

30

- Violated the common law governing unjust enrichment by receiving a benefit from Plaintiffs in the form of appraisal fees, which fees were unearned and unreasonable, not for services actually performed, in violation of federal and common law;

- Violated the common law governing unjust enrichment by receiving a benefit from Plaintiffs in the form of interest payments, late fees and penalties, and other fees, on a Loan that was fraudulently induced and arranged by Countrywide and Landsafe in the first place, based on their phony appraisals and other fraudulent schemes and conduct as alleged herein, in violation of federal and common law; and

- Violated the common law governing unjust enrichment by receiving a benefit from Plaintiffs in the form of interest payments, late fees, penalties and other fees on the Residence Loan that was fraudulently induced and fraudulently arranged by Countrywide and Landsafe in the first place based on Defendants' phony appraisals and other fraudulent schemes and conduct as alleged herein, all of which Defendants were well aware, and all of which Defendants covered up and hid from Plaintiffs for as long as they could, and continue to cover up and hide from their other victims, using armies of lawyers to obfuscate the truth and wear down their victims so they can continue to collect vast sums of money in interest, late fees, penalties, and lawyers' fees incurred in collecting past due amounts and foreclosing on the delinquent but fraudulently obtained loans, rather than come clean and disclose their fraudulent conduct and the fraudulent origins of these loans as alleged herein, including the Residence Loan.

112.    Defendants' conduct as described herein violates not only the "unlawful" prong of the UCL, but also constitutes a violation of the UCL's "unfair" prong. Defendants' conduct offends public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers. Any justification for Defendants' fraudulent conduct and business practices is far outweighed by the consequences and harm to Plaintiffs and Defendants' other victims. There were reasonable alternatives available to Defendants to further Defendants' legitimate business interests, other than the fraudulent and unethical conduct alleged herein, which continues to this day.

31

113.    Plaintiffs have suffered injury-in-fact and have lost money and property as a result of Defendants' unlawful, unfair and/or deceptive business acts and practices at issue as alleged herein.

114.    Plaintiffs seek restitution and disgorgement of all benefits and gain realized by Defendants as a result of their unfair, unlawful and/or deceptive acts and practices towards Plaintiffs as alleged herein.

115.    Defendants' conduct was also "fraudulent, misleading, or likely to deceive the public" within the meaning of California Business and Professions Code section 17200.

116.    Had the true nature of Defendants' fraudulent conduct as alleged herein been fully disclosed to Plaintiffs, they would not have taken the Residence Loan, particularly the amount of the Residence Loan.

117.    Plaintiffs have been injured in fact and suffered a loss of money and property as a result of Defendants' fraudulent, unlawful, and unfair business practices as alleged herein.

118.    Defendants have thus engaged in unlawful, unfair, and fraudulent business acts and practices entitling Plaintiffs to judgment and equitable relief against Defendants as requested in Plaintiffs' Prayer for Relief.

## <u>SECOND CLAIM FOR RELIEF</u>

**Violations of the Racketeer Influenced and Corrupt Organizations Act  (18 U.S.C. § 1962(c))**

119.    Plaintiffs incorporate by reference in this claim for relief each and every allegation in paragraphs 1 through 118 above as though set forth herein *in haec verba*.

## **The Rico Enterprise**

120.    Defendants Countrywide Financial, Countrywide Home Loans, FSL, Countrywide Bank, LandSafe, BofA, BONYM, and Shellpoint are each persons within the meaning of Title 18 United States Code section 1961(3).

121.    At all relevant times, in violation of Title 18 United States Code section 1962(c), Defendants Countrywide Financial, Countrywide Home Loans, FSL, Countrywide Bank, LandSafe, BofA, BONYM, and Shellpoint, including their directors, employees, and agents, conducted the

32

affairs of an association-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the "Countrywide Enterprise").  The affairs of the Countrywide Enterprise affected interstate commerce through a pattern of racketeering activity.

122.    The Countrywide Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of (1) generating fraudulent and phony appraisals and mortgage loans so Defendants could generate as many mortgage loans as possible, by any means possible, in order to fill up their mortgage pipeline which needed a steady stream of thousands of new mortgage loans each month, so that these mortgage loans could be bundled, securitized and sold off to Wall Street for enormous profits as mortgage-backed securities, and for the purpose of then (2) covering up and hiding this illegal and fraudulent scheme and conduct, and the fraudulent appraisals and loans they generated, including the Residence Loan, for as long as possible in order to keep receiving, among other things, interest payments, late fees, penalties, attorney's fees from collection activities, foreclosure fees, loan servicing fees, and other fees from these fraudulently originated and inflated loans, which often resulted in the borrower losing their homes and property through foreclosure, along with enormous amounts of their hard earned money in the process.

123.    While members of the Countrywide Enterprise participated in and are part of the enterprise, they also have an existence separate and distinct from the enterprise.  The Countrywide Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties and joint profit motives, and coordination of activities between Countrywide and the persons and/or entities procuring and preparing the fraudulent appraisals and loans, and then hiding and concealing this information for as long as possible so that they could continue to collect various payments and penalties on the loans, and foreclose on the loans, in order to keep making money off of the fraudulent loans as alleged herein, including the Residence Loan.

124.    Operating the Countrywide Enterprise according to policies and procedures developed and established by its executives, Countrywide controlled and directed the affairs of the Countrywide Enterprise and used the other members of the Countrywide Enterprise as instrumentalities to carry out the initial phase of the fraudulent scheme which fraudulently,

1  systematically, and uniformly produced fraudulent and grossly inflated appraisals for the common

2  purpose of generating as many mortgage loans as possible, by any means possible, so Countrywide

3  could fill up its mortgage origination pipeline which required a steady stream of thousands of new

4  mortgage loans each month, so that these mortgage loans could be bundled, securitized and sold off

5  to Wall Street for enormous profits in the form of mortgage-backed securities.  These policies and

6  procedures established by Countrywide and LandSafe's executives included fabricating phony

7  appraisals, refusing to utilize bona fide appraisers; paying above-market fees to those appraisers who

8  disregarded the appraisal "independence" requirements and manipulated the market values of subject

9  properties; rewarding appraisers who produced manipulated appraisals; blacklisting, retaliating

10 against, and firing appraisers who refused to engage in such corrupt conduct; requiring appraisers to

11 rely upon information outside the relevant market to justify manipulated valuations in appraisals;

12 and providing appraisers with false sales information and comparables to ensure the production of

13 inflated appraisals.

**The Predicate Acts**

15 125.  The Countrywide Enterprise's scheme to fraudulently, systematically and uniformly

16 produce phony, manipulated and inflated "appraisals" of properties, including Plaintiffs' Residence,

17 in order to originate ever increasing numbers of newly originated mortgage loans, and thereafter to

18 conceal the fraudulent scheme and conduct as alleged herein, was facilitated by the use of the United

19 States Mail and wire.  Among other things, Defendants used the United States Mail (including the

20 use of interstate carriers such as Federal Express) and the wires to transmit the fraudulent and

21 manipulated appraisals and loan documents within the enterprise and between members of the

22 enterprise, used the United States Mail and the wires to transmit the so-called "appraisals" and loan

23 paperwork for the fraudulent loans to Plaintiffs and other victims, and used the United States Mail

24 and the wires to transmit invoices for the so-called "appraisals."  This scheme and conduct constitute

25 "racketeering activity" within the meaning of Title 18 United States Code section 1961(1), as acts of

26 mail and wire fraud under Title 18 United States Code sections 1341 and 1343.

27 126.  The Countrywide Enterprise utilized the mail and wire in furtherance of their scheme

28 to mislead and defraud Plaintiffs and other borrowers in violation of Title 18 United States Code

sections 1341 and 1343 by, among other things, (i) requiring Plaintiffs and others to pay for the phony or inflated appraisals, (ii) obtaining principal and interest payments and various monthly fees from Plaintiffs and others on loans that were based on phony and fraudulent appraisals, which often put the borrower in a loan they did not actually qualify for, and therefore put them at risk of losing their payments, their homes and their equity, and (iii) actively concealing this information from Plaintiffs and other borrowers for as long as possible, enabling Defendants to collect loan servicing and other fees and to foreclose on the properties of those who could not afford to make payments on the fraudulently originated loans, resulting in even greater losses for Plaintiffs and other borrowers who had no knowledge of how they had been manipulated, misled and defrauded by Defendants.

127.    18 U.S.C. § 1343, the wire fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, provides in relevant part that, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice …"

128.    The Countrywide Enterprise's collective association and collective action in procuring and preparing fraudulent appraisals, originating mortgage loans based on those fraudulent appraisals, collecting above market interest rates on those fraudulent loans, and actively concealing their fraudulent conduct so they could continue to collect above market interest rates and other fees on those fraudulent loans as alleged herein, constitutes a RICO enterprise.  Every member of the Countrywide Enterprise participated in the process of misrepresenting and concealing the fraudulent appraisals and other conduct alleged herein, thereby allowing Defendants to make tens, if not, hundreds of millions of dollars in unlawful profits and ill-gotten gains as a result.

129.    In perpetrating the fraudulent schemes alleged herein, each member of the Countrywide Enterprise, either directly or indirectly through its corporate structure, has designed and implemented a uniform scheme and system of procedures to engage in the fraudulent and unlawful conduct alleged herein, which were used in virtually an identical way every day.

130.    The Countrywide Enterprise has knowingly, intentionally or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by committing the predicate acts of wire fraud within the meaning of 18 U.S.C. § 1343, by knowingly and intentionally implementing the fraudulent scheme and conduct alleged herein, all of which allowed the Countrywide Enterprise to reap enormous unlawful profits and ill-gotten gains.

131.    By devising the scheme or artifice to defraud consumers as alleged herein, the Countrywide Enterprise transmitted or caused to be transmitted by means of "wire communication in interstate or foreign commerce, ... writings, signs, signals, [and] pictures," "for the purpose of executing such scheme or artifice," including by: (i) transmitting phony USPAP "appraisals" of the borrower's property and transmitting all communications related thereto, including Plaintiffs' Residence, and (ii) originating mortgage loans based on the phony appraisals and transmitting loan documents and emails for those loans to members of the Enterprise and the borrowers and transmitting all communications related thereto, including the Residence Loan.

132.    Through the racketeering scheme alleged herein and described above, Defendants used the enterprise to dramatically increase their profits to the detriment of Plaintiffs and other borrowers in this and other states.

133.    The Countrywide Enterprise organized and implemented the scheme, and ensured that it would continue uninterrupted for many years by actively concealing its fraudulent and unlawful conduct as alleged herein.

134.    The Countrywide Enterprise knew the scheme would defraud borrowers, yet each member of the Countrywide Enterprise remained a participant despite the fraudulent and unlawful conduct of the Enterprise. At any point while the scheme had been in place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence.  Rather than ending the scheme, or ending their participation in the scheme, the members of the Countrywide Enterprise deliberately chose to continue it, to the direct detriment of Plaintiffs and others who have been deceived and misled by the fraudulent and unlawful conduct alleged herein, and Plaintiffs have suffered injury and damage as a result of the pattern of racketeering activity alleged herein.

135.    Because Plaintiffs unknowingly paid for a fraudulent appraisal by Countrywide/Landsafe, and were given a substantial Loan on their Residence by the Enterprise based on a phony and fraudulent appraisal that was never actually performed and that was grossly inflated, Plaintiff is a direct victim of the Countrywide Enterprise's wrongful and unlawful conduct as alleged herein, and Plaintiffs' injuries and damage are a direct, proximate, foreseeable and natural consequence of Defendants' fraudulent and unlawful conduct as alleged herein.  Moreover, because Plaintiffs' injury and damages are a direct result of Defendants' fraudulent conduct and subsequent fraudulent concealment, there are no independent factors which may be used to account for the economic injuries alleged by Plaintiffs herein, and the loss of money and property by Plaintiffs clearly satisfies RICO's injury requirement.

136.    Plaintiffs are entitled to recover treble damages for the injuries they have sustained, according to proof, as well as restitution and costs or suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

137.    As a direct and proximate result of the alleged racketeering activities and conduct engaged in by Defendants generally, and the specific conduct engaged in by Defendants with respect to Plaintiffs, Plaintiffs are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting the Countrywide Enterprise from further engaging in the unlawful conduct alleged herein.

138.    Under the provisions of Section 1964(c) of RICO, members of the Countrywide Enterprise are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have or will sustain, plus the costs of bringing this suit, including their reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF

**Violation of the Racketeer Influenced and Corrupt Organizations Act,**

**Conspiracy to Violate Title 18 United States Code section 1962(c)(18 U.S.C. § 1962(d))**

139.    Plaintiffs incorporate by reference in this claim for relief each and every allegation in paragraphs 1 through 138 above as though set forth herein *in haec verba*.

37

140.   As alleged herein above, members of the Countrywide Enterprise conspired to violate the provisions of Title 18 United States Code section 1962(c) in violation of Title 18 United States Code section 1962(d).

141.   As alleged herein above, Defendants, having directed and controlled the affairs of the Countrywide Enterprise, were aware of the nature and scope of the Enterprise's unlawful conduct and scheme, and agreed to participate in it.

142.   As a direct and proximate result, Plaintiffs have been injured in their business and property by the predicate acts which make up the Countrywide Enterprise's pattern of racketeering activity as alleged herein.

## **FOURTH CLAIM FOR RELIEF**

### **Unjust Enrichment**

143.   Plaintiffs incorporate by reference in this claim for relief each and every allegation in paragraphs 1 through 142 above as though set forth herein *in haec verba*.

144.   By their fraudulent and unlawful acts and conduct as alleged herein, Defendants have been and continue to be unjustly enriched at the expense of Plaintiffs.

145.   Among other things, Defendants knowingly and fraudulently created a phony appraisal for Plaintiffs' Residence which put Plaintiffs into a Residence Loan they would not be able to afford, particularly when the monthly payments on the Residence Loan ballooned from $10,406.25 a month to $15,046.25 a month.  Defendants fraudulently concealed the phony appraisal from Plaintiffs, covering up and hiding this illegal and fraudulent scheme and conduct, and the fraudulent appraisals and loans they generated, including the Residence Loan, for as long as possible in order to keep receiving, among other things, interest payments, late fees, penalties, attorney's fees from collection activities, foreclosure fees, loan servicing fees, and other fees from these fraudulently originated and inflated loans, which often resulted in the borrower losing their homes and property through foreclosure, along with enormous amounts of their hard earned money in the process.

1786874.1 -- 32349.0001

146.    The Residence Loan to Plaintiffs was the result of outright fraud, and it would be inequitable and unconscionable, and against all principles of equity and law for Defendants to retain any of their profits, principal payments, interest payments, fees, penalties, and other benefits and amounts they received from Plaintiffs as a result of their fraudulent, deceptive, and misleading conduct as alleged herein.

147.    Plaintiffs therefore seek restitution from Defendants, and seek an order of this Court disgorging all profits, principal payments, interest payments, fees, penalties, and other benefits and amounts Defendants received from Plaintiffs as a result of their fraudulent, deceptive, and misleading conduct as alleged herein.

**FIFTH CLAIM FOR RELIEF**

**Fraud**

148.    Plaintiffs incorporate by reference in this claim for relief each and every allegation in paragraphs 1 through 147 above as though set forth herein *in haec verba*.

149.    Countrywide and Landsafe misrepresented that they had prepared an "appraisal" of real property that was performed in accordance with strict USPAP's legal and ethical standards governing appraisals, and that Plaintiff was charged for a legally-mandated "appraisal" of real property prepared in accordance with strict USPAP's legal and ethical standards governing appraisals.

150.    Countrywide and Landsafe concealed and suppressed material facts, namely, the fact that they had procured, prepared and charged for an appraisal that was not prepared in accordance with USPAP's legal and ethical standards but rather was inflated or otherwise manipulated.

151.    Completely unknown to Plaintiffs, Countrywide and Landsafe also prepared a secret phony appraisal of Plaintiff's Residence.  This secret phony "appraisal" placed a market value of $3,494,500 on Plaintiffs' Residence – *$644,500 more than* the original appraisal performed by Countrywide/Landsafe only three weeks earlier.  This Second "Appraisal" was completely fabricated by Landsafe and Countrywide since the appraiser named in the Second Appraisal report never came

1   to the Duffs' Residence to inspect it or appraise it as stated in the report, nor did anyone else ever

2   come to the house during this period of time to inspect it or appraise the Residence.

3        152.   The phony Second Appraisal was completely fabricated by Countrywide and

4   Landsafe and delivered to Countrywide's underwriters to provide support for Plaintiffs' Residence

5   Loan amount of $1,850,000.  The phony Second Appraisal was also likely used to provide internal

6   documentary support for the securitization of the Residence Loan, as well as support for the

7   Residence Loan if there was ever an audit of Countrywide and its loans by state or federal

8   authorities, or by insurance companies who needed to determine the value of the Countrywide loans

9   which had been turned into mortgage backed securities before they insured them and Countrywide

10  sold them off to Wall Street investors.

11       153.   This fraudulent scheme and illegal conduct by Countrywide and Landsafe was

12  completely unknown by Plaintiffs until recently, but nevertheless resulted in Plaintiffs being

13  burdened with a relatively high interest rate home mortgage Loan they did not actually qualify for,

14  and which they eventually would not be able to afford to repay when the monthly mortgage payment

15  ballooned from $10,406.25 a month, to $15,046.19 a month – *a 50% increase* in their monthly

16  mortgage Loan payment.

17       154.   By 2016, ten years after Plaintiffs had received the fraudulent Loan from

18  Countrywide, Plaintiffs had timely paid Defendants *over $1,248,750 in interest payments alone,*

19  while the principal balance of the Residence Loan *had not been reduced by a single penny.*

20       155.   Plaintiff justifiably relied on the reasonable expectation that Defendants would act in

21  compliance with the law, which included ordering and preparing legally-mandated, independent and

22  honest appraisals of Plaintiffs' Residence conducted in accordance with USPAP standards so that

23  Plaintiffs would not be misled about the value of their Residence, or the amount of the loan for

24  which they qualified, when they refinanced their Residence.  Plaintiffs also justifiably relied on the

25  reasonable expectation that Countrywide and Landsafe would not fabricate a phony appraisal of their

26  Residence, and hide it from Plaintiffs for years, in order to qualify Plaintiffs for a much larger loan

27  than they actually qualified for so that Countrywide and Landsafe could further their illegal and

28  fraudulent scheme of generating as many large subprime home mortgage loans as possible, by any

means possible, so they could fill up their mortgage origination pipeline which needed a steady stream of thousands of new home mortgage loans each month, so that these mortgage loans could be bundled, securitized and sold off to Wall Street for enormous profits as mortgage-backed securities.

156.    Had Plaintiffs known the truth about Countrywide's and Landsafe's phony appraisal and their manipulation of the value of their Residence in order to place them into larger Loan than they would be able to afford, they would not have accepted the Residence Loan in the first place.

157.    Defendants knew their concealment and suppression of materials facts about the phony appraisal and the resulting fraudulent Loan they made to Plaintiffs was false and misleading and constituted fraudulent conduct and fraudulent concealment of this conduct.

158.    As a result of Defendants' fraudulent conduct and fraudulent concealment of material facts and information as alleged herein, Plaintiffs have been injured in fact and have suffered a large loss of money and property as alleged herein.  Plaintiffs would not have taken the Residence Loan in the first place had it not been for Defendants' fraudulent conduct and active concealment of that fraudulent conduct and material information as alleged herein.

159.    Plaintiffs justifiably relied upon Defendants' knowing, intentional, and fraudulent omission of material facts and information as alleged herein, and further justifiably relied on Defendants' knowing, intentional, and active and fraudulent concealment of material facts and information as alleged herein.  By concealing this information from Plaintiffs about how they manipulated property appraisals and prepared a phony appraisal on Plaintiffs' Residence to justify Plaintiffs' jumbo Loan amount, Defendants intended to induce, and did in fact induce, Plaintiffs into accepting the Residence Loan from Countrywide, whether or not Plaintiffs actually qualified for the Residence Loan.

160.    As a direct and proximate result of Defendants' fraudulent conduct and their active fraudulent concealment as alleged herein, Plaintiffs have been damaged in an amount according to proof at trial.

41

1786874.1 -- 32349.0001

## SIXTH CLAIM FOR RELIEF
### Violations of the Fair Debt Collection Practices Act
### (15 U.S.C. §§ 1692 –1692p)

161.    Plaintiffs incorporate by reference in this claim for relief each and every allegation in paragraphs 1 through 160 above as though set forth herein *in haec verba*.

162.    Pursuant to the provisions of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692a *et seq*. (the "FDCPA") and The Rosenthal Fair Debt Collection Practices Act, California Civil Code §§ 1788 et seq. (the "Rosenthal Act"), the Duffs exercised their rights under the FDCPA and the Rosenthal Act and disputed the validity of the debt allegedly owed Defendants based on the Residence Loan, and did so for the primary purpose of auditing the Residence Loan to make sure all amounts were correct and everything else was in order with respect to the Residence Loan as provided for by the FDCPA and the Rosenthal Act.

163.    Among other things, the Residence Loan involved a refinancing of their principal dwelling, the purpose of which was for personal, household and family use, and as such it constitutes a consumer credit transaction subject to rescission under 15 U.S.C. § 1635.

164.    Pursuant to 15 U.S.C. § 1692g(b) and California Civil Code § 1788.17, after Plaintiffs exercised their right to dispute the validity of the debt under federal and state law, Defendants were required to cease collection of the debt, or any disputed portion thereof including, but not limited to, foreclosing on Plaintiffs' mortgage Loan on the Residence until the alleged debt had been fully and accurately verified by Plaintiffs or their agents.  The pertinent statutes and regulations required that Defendants provide all information Plaintiffs requested pursuant to certain statutes and regulations including, but not limited to, 12 U.S.C. § 2605(k)(1)(D); 15 U.S.C. § 1641(f)(2); Reg. X, Subpart C: 12 C.F.R. § 1024.36(d).  Plaintiffs requested the information Plaintiffs were authorized to request pursuant to the statutes and regulations.

165.    After repeated attempts by Plaintiffs over many months to obtain all of the information they were entitled to receive from Defendants pursuant to the statutes and regulations, Plaintiffs received some of the information about their Loan but not all of the requested information, including certain critical information necessary to complete an audit of their Loan as allowed and required by the statutes and regulations.

42

166.    Plaintiffs kept requesting the missing information and their rights to obtain it, and kept asserting their rights under 15 U.S.C. § 1692g(b) and California Civil Code § 1788.17, that the validity of the debt/Loan was disputed and therefore Defendants were required to cease all collection of the debt pursuant to the applicable statutes.

167.    Notwithstanding Plaintiffs' repeated requests for the missing information, which Defendants were required to produce pursuant to the statutes and regulations, and notwithstanding Plaintiffs' repeated efforts to remind Defendants that they were required under the statutes and regulations to cease all collection of the debt/Loan pursuant to the cited statutes and regulations, Defendants nevertheless ignored Plaintiffs' repeated requests and ignored the law and foreclosed on Plaintiff's Loan and Residence anyway.

168.    Among other things, the statutes provide for private right of action pursuant to 12 U.S.C. § 2605(f) and § 2614; and 15 U.S.C. § 1640(a) for a failure to comply: "Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts…" 12 U.S.C. § 2605(f).

169.    As a direct and proximate result of Defendants' conduct as alleged herein, and their failure to fully comply with FDCPA, the Rosenthal Act and corresponding regulations, including but not limited to those alleged herein, Plaintiffs have been unable to complete a full audit of their Loan as provided for by the statutes, and Plaintiffs have been damaged as a result and are entitled to any and all damages provided by the FDCPA, the Rosenthal Act and corresponding regulations, and as otherwise provided for by law.

## SEVENTH CLAIM FOR RELIEF

### Breach of Covenant of Good Faith and Fair Dealing

170.    Plaintiffs incorporate by reference in this claim for relief each and every allegation in paragraphs 1 through 169 above as though set forth herein *in haec verba*.

171.    Plaintiffs are borrowers under the Residence Loan and the Contiguous Property Loan, and Defendants Countrywide, BofA, and BONYM served as lenders.  The Residence Loan and Contiguous Property Loan were both governed by California law and thus contained an implied

43

1  promise of good faith and fair dealing. Plaintiffs remained current on their obligations under both the

2  Residence Loan and the Contiguous Loan until they contacted BofA about a potential mortgage

3  modification.  BofA then induced Plaintiffs to default on the two loans by stating that it would only

4  consider a mortgage modification if they fell behind on payments.  BofA then refused to deal with

5  the Plaintiffs in good faith, including by rejecting several mortgage modification applications

6  without explanation.   That conduct directly interfered with Plaintiffs' performance under the

7  Residence Loan and the Contiguous Property Loan.  All fees, penalties and charges on the Residence

8  Loan and the Contiguous Property Loan in favor of Defendants were the direct result of that

9  interference.

10  172.   Plaintiffs are entitled to all damages arising from that interference from Defendants

11  BofA and BONYM, including all fees, penalties and other charges.  In addition, BONYM's claims

12  should be reduced by those amounts, to the extent they are otherwise allowed.

13

14  **EIGHTH CLAIM FOR RELIEF**

15  **Promissory Estoppel**

16  173.   Plaintiffs incorporate by reference in this claim for relief each and every allegation in

17  paragraphs 1 through 172 above as though set forth herein *in haec verba*.

18  174.   As described above, Plaintiffs remained current on their obligations under both the

19  Residence Loan and the Contiguous Loan until they contacted BofA about a potential mortgage

20  modification.  BofA then induced Plaintiffs to default on the two loans by stating that it would only

21  consider a mortgage modification if they fell behind on payments.  Even as interest and penalties

22  piled up, BofA repeatedly sent Plaintiffs new modification statements, then rejecting them without

23  explanation.  In so doing, BofA was inviting applications it apparently had no intention of granting,

24  ultimately dooming Plaintiffs to foreclosure.  Plaintiffs relied on BofA's promises by ceasing

25  payments, and that reliance was both reasonable and foreseeable given that BofA had expressly

26  conditioned any mortgage modification on Plaintiffs' falling behind.

27  175.   Plaintiffs are entitled to all damages arising from their reliance on BofA's promises

28  from Defendants BofA and BONYM, including all fees, penalties and other charges.  In addition,

44

1  BONYM's claims should be reduced by those amounts, to the extent they are otherwise allowed.

2

3                              **<u>PRAYER FOR RELIEF</u>**

4          Plaintiffs request that the Court enter judgment against Defendants as follows:

5          1.      Awarding Plaintiffs compensatory damages in an amount according to proof at trial;

6          2.      Rescinding the mortgage Loan contract between Plaintiffs and Countrywide in its

7  entirety, and restoring the parties to their original status before the contract was made;

8          3.      Awarding Plaintiffs restitution and disgorgement of Defendants' revenues and/or

9  profits associated with Plaintiffs' mortgage loan transaction with Countrywide;

10         4.      Awarding Plaintiffs treble damages in an amount according to proof at trial;

11         5.      Awarding interest on all amounts wrongfully taken from Plaintiffs, starting with the

12  date the amounts were collected and continuing through the date of entry of judgment in this action;

13         6.      Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in

14  connection with the commencement and prosecution of this action;

15         7.      Disallowing or reducing Proof of Claim No. 8, filed by BONY, by and through

16  Bayview and Proof of Claim No. 9 filed by BONYM; and

17         8.      For such other and further relief as provided for by law or the Court as it deems just

18  and proper.

19  Dated:  October 21, 2019              LAW OFFICE OF JON BORDERUD

20

21                                        By:  ___/s/ Jon Borderud_____
                                               Jon Borderud

22                                        G&B LAW, LLP

23

24                                        By:  ___/s/ Jeremy Rothstein_____
                                               Jeremy Rothstein

25                                             Attorney for Plaintiffs
                                               CHARLES DUFF and CATHRYN DUFF

26

27

28